**FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

FILED

OCT 1 7 2002

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

| | |
|---|---|
| MICHAEL DASRATH, | : |
|           Plaintiff | : |
| v. | : |
| | : |
| CONTINENTAL AIRLINES, INC., | : |
|           Defendant | : |
|           and | : |

Civ. A. No. 02-2683
(DRD)

EDGARDO S. CUREG, and
THE ARAB AMERICAN ANTI-DISCRIMINATION
COMMITTEE, on behalf of its members
and its constituents,

          Plaintiffs

v.

Civ. A. No. 02-2684
(DRD)

CONTINENTAL AIRLINES, INC.,

          Defendant

**OPINION**

J.C. Salyer, Esq.
Edward L. Barocas, Esq.
American Civil Liberties Union
of New Jersey Foundation
P.O. Box 750
Newark, NJ 07101

1

Reginald T. Shufford, Esq.
E. Vincent Warren, Esq.
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004

Attorneys for Plaintiffs

Peter B. Van Deventer, Jr., Esq.
Douglas H. Amster, Esq.
St. John & Wayne, L.L.C.
Two Penn Plaza East
Newark, NJ 07105

Attorneys for Defendant

**DEBEVOISE, Senior District Judge**

In one of these related cases Plaintiff Michael Dasrath asserts claims against Defendant Continental Airlines ("Continental") under 42 U.S.C. § 1981; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; and the New Jersey Law against Discrimination (the "NJLAD"), N.J.S.A. 10:5.1 et seq., alleging that Continental engaged in unlawful discrimination (in violation of all three statutes) when it removed him from one of its flights prior to its departure from Newark airport on December 31, 2001.  In a separate complaint Plaintiff Edgardo S. Cureg alleges that Continental violated the same three statutes when it removed him from the same flight.  The American Arab Anti-Discrimination Committee (the "ADC"), on behalf of its members, joins in Cureg's suit.  Dasrath's complaint asserts a claim for damages and for declaratory and injunctive relief. Cureg and the ADC seek only declaratory and injunctive relief.

2

Continental moves to dismiss all Plaintiffs' claims for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and to dismiss certain of their claims for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).  It also moves to dismiss claims for monetary relief on the ground that any remedies should be limited by the terms of the contracts under which Cureg and Dasrath traveled.  For the reasons stated below, this joint motion will be denied in all respects.

## BACKGROUND

For the purposes of a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all the allegations in the complaints; and where a defendant challenges a plaintiff's standing or the ripeness of a cause of action on the face of the complaint, the court must similarly assume the truth of a plaintiff's allegations.  Med. Soc'y of New Jersey v. Herr, 191 F. Supp. 2d 574, 578 (D.N.J. 2002).  Accordingly, the following account of the facts relevant to the motion is drawn entirely from the complaints.[1]

---

[1] In the case of Cureg and the ADC, the operative complaint is the Amended Complaint filed after Continental moved to dismiss.  Continental objected to the amendment, contending that Cureg and the ADC cannot amend the complaint as of right after a motion to dismiss in lieu of an answer.  But Fed. R. Civ. P. 15 clearly provides that a party may amend a pleading as of right any time before a responsive pleading is served.  Continental has filed no answer; accordingly, Cureg and the ADC did not need to seek leave of the court to amend the complaint.

I.    The Cureg Complaint

    A.    Plaintiffs

Plaintiff Cureg is a 34 year old Filipino citizen and has been a permanent resident of the United States since April of 2000.  He is a graduate student at the University of South Florida ("USF") in Tampa, where he resides.

Plaintiff ADC is an organization committed to defending the rights of people of Arab descent and to combating defamation and stereotyping directed at them.  Its members number in the thousands.

    B.    The Events of December 31, 2001

On December 31, 2001, Cureg planned to fly from London-Gatwick Airport to Tampa with a stopover in Newark.  While at Gatwick, Cureg encountered a colleague from USF, Dr. Saraleesan Nadarajah, who was also heading back to Tampa on the same Continental flight.  The two men spoke briefly before boarding the plane to Newark.  They were seated in different sections of the plane and did not speak during the flight.

Before disembarking in Newark and then again after passing through customs and rechecking his baggage, Cureg placed a cell phone call to another friend and colleague at USF. Informed that Nadarajah was on the same flight, the friend said he would like to speak with Nadarajah.  When Cureg encountered Nadarajah at the

4

gate assigned to the flight to Tampa (# 1218, scheduled to depart at 4:10 pm), Cureg mentioned the conversation with their common friend and offered Nadarajah the use of his cell phone to call him back.  While Nadarajah was on Cureg's phone, a boarding announcement was made, and Cureg told Nadarajah that he could return the phone after they had boarded the plane.

Cureg had been upgraded to first class for the flight to Tampa.[2]  As Nadarajah passed Cureg on the way to his seat in coach, he returned the phone, saying, "Thank you," to which Cureg replied, "You're welcome."

After the pilot announced that the flight would remain at the gate so that some luggage could be re-examined by security personnel,  Nadarajah came forward to the first class cabin and sat in the empty seat beside Cureg.  A passenger later identified as Dasrath sat directly behind Cureg.  Dasrath did not communicate with the other two men.

Three to five minutes later, the flight supervisor approached and asked the three men to gather their belongings and follow him off the plane, and they complied.  The flight supervisor explained that the pilot had said a passenger was "uncomfortable" with their presence.  After checking the

_____

[2]He is a frequent flier with Northwest Airlines, flying more than 25,000 miles per year; and as a result of a partnership between Northwest and Continental, he receives frequent flier benefits on both airlines.

5

identities of the three men and confirming that Cureg and
Nadarajah had been on the London-Newark flight, the flight
supervisor left for about five minutes to speak with the pilot,
attempting to convince him that the men presented no safety
concerns.  But he failed to persuade the pilot to let the three
men back on the plane.[3]  At no time did the pilot or any security
personnel question Cureg or conduct any investigation prior to
ejecting him from the flight.

   With the assistance of the flight supervisor and gate staff,
Cureg and Dasrath were provided with seats on a 5:00 pm flight to
Orlando, and with car service to take them from Orlando to Tampa.

   C.   Allegations Relevant to Claims of Continuing
        Discrimination by Continental against Cureg and ADC
        Members

   In support of his claim for injunctive relief, Cureg alleges
that he has a reasonable fear of "similar mistreatment" by
Continental . . .  in the future unless such conduct is
enjoined."  He does not specifically describe any plans to fly
with Continental in the future, but he states that he is a
frequent flier with Northwest "and, by extension, its partners,
including Continental," and avers that Continental has "engaged
in a practice of removing certain non-white passengers."

_____

[3]The Cureg complaint asserts "on information and belief"
that the flight supervisor told the men he would support them if
they decided to take legal action.

6

The ADC states that its members (including its 15 board
members) fly regularly on major airlines including Continental,
and that it holds an annual conference attended by approximately
2000 people from across the country, some of whom have in
previous years flown Continental to the conference.  The ADC
similarly alleges that its members "face a likelihood" of being
subjected to discriminatory treatment in the future as a result
of their continuing travel on Continental . . . and [its]
practice of discriminating against passengers it perceives as
Arab or Muslim."

The ADC contends that since September 11 it has "documented
more than 60 incidents of alleged discrimination against Arab
Americans by domestic and foreign airlines"; and it describes one
such incident involving Continental.[4]

The complaint also recounts Department of Transportation
reports of complaints of discrimination by air carriers (for
example, 84 in the period between January and March 2002),
"including several against Continental."


II.   The Dasrath Complaint

_____

[4]In that incident, December 7, 2001, an ADC member
complained about luggage searches (first about the manner in
which a primary search was conducted and then about his selection
for a secondary search along with another man of apparently
middle-eastern descent).   When the ADC member asked with whom he
could file a complaint about the searches he was met with the
reply, "George Bush, President of the United States."

A.    Plaintiff

Dasrath is a U.S. Citizen born in Guyana who moved to this country (specifically to Brooklyn, New York) with his parents when he was one year old.  He holds an MBA and works in "Consulting Services" for J.P. Morgan Chase in New York City. Dasrath's wife and two sons live in Tampa, and on December 31, 2001 he planned to travel to join them there on Continental's flight # 1218 - the same flight on which Cureg planned to fly.

Because Dasrath's wife is an employee of Continental, he is entitled to fly standby at a considerably reduced fair as a "non-revenue" ticket holder.  He relies on the privilege to fly to Tampa approximately twice a month to visit his family.  The tickets he obtains show his non-revenue status.[5]


B.    The Events of December 31, 2001

Dasrath passed through security essentially without incident (His carry-on baggage was subjected to a random x-ray, and his belt buckle set off a metal detector.)  When he arrived at the gate, he was informed that the plane was not full and assigned a seat in the first class section.

Dasrath saw Nadarajah board the plane and greet Cureg on his way to the coach cabin, then saw him return to first class and

---

[5]Dasrath alleges that Continental employees, including the pilot and the gate agent who ultimately removed him from the aircraft, were aware of his non-revenue status.

converse with Cureg.[6]  At no time did he speak with any other passengers.

After Nadarajah had returned to the first class cabin to talk with Cureg, Dasrath observed a white female passenger enter the first class cabin (coming from coach) and noticed that she was "staring suspiciously" at the three men.  She returned to her seat, then came back again into first class, looked at the three men, and exited the plane with a flight attendant she had approached.  The passenger returned to her seat, and a short time later the pilot announced that the plane would remain at the gate temporarily while some luggage was re-examined by security personnel.[7]

The white passenger soon returned to the first class cabin and signaled to the pilot, who was standing outside the cockpit. The captain walked past Dasrath to speak to the passenger. Dasrath, turning around and observing their conversation, saw the woman point at the three men and heard her tell the captain that "three brown-skinned men" were "behaving suspiciously."  The pilot then exited the plane without addressing any of the three men.

---

[6]The Dasrath complaint describes the interaction but does not name the two other men.

[7]In this detail the complaints differ – the Cureg complaint placing the announcement before Nadarajah's return to the first class cabin.

9

A short time later a Continental official boarded the plane
and asked the three men to gather their belongings and leave the
aircraft, which they did.  The complaint alleges that at no time
did the captain or any security personnel investigate Dasrath's
conduct before ejecting him from the flight.

The Dasrath complaint provides substantially the same
description of the arrangements that Continental employees made
to get the three men to Florida.  Once he arrived in Tampa,
Dasrath was unable to locate his suitcase (which had remained on
the Tampa bound flight).  When he returned to the Tampa airport
the following day for his trip back to New York, he found that
his suitcase had been opened and rummaged through and that the
computer he had packed in it (intended as a gift for his sons)
had been torn apart and destroyed.

C.    Allegations Relating to Claims of Continuing
       Discrimination by Continental against Dasrath

While Dasrath does not point to specific plans to travel on
Continental in the future, the complaint does state that he takes
advantage of his non-revenue ticket privileges to fly to Florida
approximately twice a month on Continental.

With respect to Continental's practices (apart from its
conduct in connection with Dasrath's removal from flight 1218),
the Dasrath complaint presents the same description of
discrimination complaints against airlines generally (including

10

Continental) as that offered in the Cureg complaint.  Like the
Cureg complaint, the Dasrath complaint alleges that injunctive
relief is appropriate to remedy "continuing discriminatory
conduct" and restrain the Defendant from further engaging in the
"practices" it describes.

## DISCUSSION

I.    Motion to Dismiss Claims under Rule 12(b)(6)

A complaint must be dismissed pursuant to Rule 12(b)(6) for
failure to state a claim upon which relief can be granted if the
court finds "beyond doubt that plaintiff can prove no set of
facts in support of his claim which would entitle him to relief."
Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  In analyzing a
motion to dismiss, all allegations set forth in the complaint
must be accepted as true and all reasonable inferences must be
drawn in the plaintiff's favor.  Schrob v. Catterson, 948 F.2d
1402, 1405 (3d Cir. 1991).

Continental offers essentially three arguments in support of
its motion to dismiss the complaints for failure to state a
claim.  First, it argues that its employees' alleged conduct is
sheltered by 49 U.S.C. § 44941, which offers broad (but not
complete) protection from liability to air carriers and their
employees reporting "suspicious activities" to security
personnel.  Second, Continental contends that it is shielded from

11

liability because its employees were acting within their
authority under 49 U.S.C. § 44902, which permits air carriers to
refuse transport to passengers they decide might be "inimical to
safety." Finally, Continental argues that the claims articulated
in the Cureg complaint are pre-empted by the Warsaw Convention.


A.    Immunity under 49 U.S.C. § 44941

Continental's contention that it and its employees are
immune from liability under § 44941 appears not to have any
relevance to the asserted claims and accordingly does not provide
any basis for dismissing them. Section 44941 provides in full

> (a) In General. – Any air carrier or foreign air carrier or
> any employee of an air carrier or foreign air carrier who
> makes a voluntary disclosure of any suspicious transaction
> relevant to a possible violation of law or regulation,
> relating to air piracy, a threat to aircraft or passenger
> safety, or terrorism, as defined by section 3077 of title
> 18, United States Code, to any employee or agent of the
> Department of Transportation, the Department of Justice, any
> Federal, State, or local law enforcement officer, or any
> airport or airline security officer shall not be civilly
> liable to any person under any law or regulation of the
> United States, any constitution, law, or regulation of any
> State or political subdivision of any State, for such
> disclosure.
> (b) Application.--Subsection (a) shall not apply to--
> (1) any disclosure made with actual knowledge that the
> disclosure was false, inaccurate, or misleading; or
> (2) any disclosure made with reckless disregard as to the
> truth or falsity of that disclosure.

By its terms the law provides shelter not to actions taken
on the basis of disclosures but rather to the disclosures
themselves. Such immunity as the statute provides accordingly

12

does not reach the conduct on which Plaintiffs predicate their claims. As the complaints themselves indicate, and as Plaintiffs' opposition papers confirm, Plaintiffs base their claims on the ultimate decision to remove Cureg and Dasrath from flight 1218, and on an alleged pattern of similar actions, not on any communications that might have been incidental to such actions. Section 44941 is therefore irrelevant to the asserted causes of action.[5]

    B.    Immunity under § 44902

Alternatively Continental invokes § 44902(b), which provides

    Subject to regulations of the Under Secretary, an air carrier, intrastate air carrier, or foreign air carrier may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety.

As the parties agree, § 44902 gives airline personnel broad, but not absolute, discretion to remove passengers purportedly for safety reasons. Their decisions must have a rational basis in safety. As one of the leading cases on the topic puts it,

    The test of whether or not the airline properly exercised its power under [§ 44902] to refuse passage to an applicant or ticket-holder rests upon the facts and circumstances of the case as known to the airline at the time it formed its opinion and made its decision and whether or not the opinion

---

[5]It should be noted also that § 44941 by its terms does not provide absolute protection to disclosures of suspicious activity. For example, a person who told security personnel, entirely on the basis of a passenger's race, that that passenger was dangerous would clearly be reckless as to the truth or falsity of the statement and thus not sheltered by the provision.

and decision were rational and reasonable and not capricious or arbitrary in the light of those facts and circumstances. Williams v. Trans World Airlines, 509 F.2d 942, 948 (2d Cir. 1975).

Continental notes correctly that the standard for assessing an airline's decision to refuse to transport a passenger is a very lenient one, requiring only that the carrier's decision not be arbitrary or capricious. Although Williams uses the term "reasonable," among others, in describing the scope of the discretion authorized by the statute, it is important to recognize that here "reasonable" draws its meaning from the terms accompanying it, and that § 44902 does not permit a carrier to be held liable where it is merely negligent in deciding that a passenger might be "inimical to safety." See Adamsons v. American Airlines, 444 N.E.2d 21, 24-25 (N.Y. 1982) ("We do not believe that Congress, in enacting the Federal Aviation Act, intended to test the airline's discretion to deny passage to certain persons by standards of negligence.").[9] As Williams and later cases applying § 44902 confirm, the statute protects any decision that

---

[9]Noting that decisions to transport passengers must often be made on the spur of the moment, the court in Adamsons (addressing the refusal to transport a sick passenger) refused to impose a duty of investigation on carriers:

Absent a showing of arbitrariness, plaintiff's argument that defendant was negligent in failing to obtain information necessary to make its decision is unpersuasive. In this case, there was no showing of arbitrariness as a matter of law.

444 N.E.2d at 25.

14

is not capricious or arbitrary.  See, e.g., Schaeffer v.
Cavallero, 54 F. Supp. 2d 350, 351 (S.D.N.Y. 1999) (Refusal to
transport cannot give rise to liability unless arbitrary and
capricious.); Norman v. TWA, 2000 WL 1480367, at *2 (S.D.N.Y.
Oct. 6, 2000) (same); Christel v. AMR Corp., Civil Action No.
00-CV-6496, 2002 U.S. Dist. LEXIS 17688, at 13-14 (S.D.N.Y. Sept.
20, 2002) (same).

As Williams implies, and as the cases following it
illustrate, the standard for reviewing carriers' decisions is not
a subjective one:  even in Adamsons, which offers one of the most
emphatic endorsements of broad discretion under § 44902, the
court stated that the carrier's discretion is protected "if
exercised in good faith and for a rational reason."  444 N.E.2d
at 24 (emphasis added).

Nevertheless, the objective assessment of a carrier's
decision must take into account all the circumstances surrounding
the decision, including the (perhaps limited) facts known at the
time; the time constraints under which the decision is made; and,
not least, the general security climate in which events unfold.
In Williams, for example, the court noted that one of the factors
contributing to the decision not to transport the plaintiff was
"the danger of hijacking in light of those recently experienced
[in 1969] by TWA and other airlines."  509 F.2d at 945.  In the
present case, it should not be forgotten that the decisions at

15

issue were made in an atmosphere pervaded by the fears and uncertainty's arising from the events of September 11, 2001. There is no denying that, as the Court of Appeals recently observed, those events and their aftermath are "reflected in a thousand ways in legislative and national policy, the habits of daily living, and our collective psyches." North Jersey Media Group, Inc. V. Ashcroft, No. 02-2524, 2002 WL 31246589, at *3 (3d Cir. Oct. 8, 2002).

With this standard in mind, Continental argues that the conduct alleged in the complaints is authorized by the statute and therefore cannot give rise to liability. In defense of its position it points to facts alleged in the complaints (such as Mr. Nadarajah's entry into the first class cabin) and suggests that those facts could have provided the basis for a rational determination that Plaintiffs represented a safety threat.

But as Plaintiffs observe, such a factual argument is out of place on a motion to dismiss.[10] At this stage of the proceedings Plaintiffs need only plead, not prove or even offer proof, that Continental's conduct was arbitrary and therefore beyond the scope of conduct authorized by § 44902. They have satisfied this basic requirement.

The Plaintiffs have sufficiently alleged that Cureg's and

---

[10]None of the cases that Continental cites in support of its position involved motions to dismiss.

16

Dasrath's removal from the flight was the product of intentional racial discrimination,[11] not of a rational determination that their presence was "inimical to safety." Even if some of the facts alleged could lend support to an inference that the removal decision was motivated by safety concerns, the complaints nevertheless allege clearly and specifically that the motivating factor was in fact not safety but race; and they state allegations that, if true, might provide at least some support for an inference of discriminatory intent. Plaintiffs have accordingly pleaded sufficiently that the removal was not the sort of rational safety measure shielded by § 44902.[12]

---

[11] Although, as discussed below, Continental does not directly argue that Plaintiffs fail to state claims under the three laws they invoke, it should be noted that their allegations do satisfactorily plead intentional discrimination, which is an element of all three of his claims. The elements of a claim under § 1981, are (1) plaintiff's membership in a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981, including the right to make and enforce contracts. Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 569 (3d Cir. 2002). To state a Title VI claim, a plaintiff must also allege (1) membership in a minority and (2) intentional discrimination; the third element of a Title VI claim is receipt of federal funds by the defendant. 42 U.S.C. § 2000d. The NJLAD prohibits discrimination in places of public accommodation based on race. N.J.S.A. 10:5-12(f), requiring a showing that the defendant operates a place of public accommodation, that the plaintiff is a member of a protected class, and that he or she was denied equal treatment on the basis of his or her membership in a protected class.

[12] Curiously, Continental does not directly argue that Plaintiffs fail to state claims for intentional discrimination, although such an argument would appear to be a logical implication of the contention that § 44902 immunizes the alleged

17

Continental's motion to dismiss the complaints on § 44902 grounds
must therefore be denied.

It must be emphasized that this ruling is in the context of
motion to dismiss, when plaintiffs have the benefit of every
favorable inference to be drawn from the facts as alleged.
Plaintiffs' burden will be greater on a motion for summary
judgment, which must be decided on the basis of undisputed or
disputed facts (not allegations) and inferences favorable to the
non-moving party to be drawn from such facts.  In this case
Plaintiffs' burden will be a heavy one considering the heightened
actual dangers arising from the increased risk of terrorist acts,
the catastrophic consequences in the case of air travel of the
failure to detect such acts in advance, and the necessity that
pilots make safety decisions on short notice without the

---

conduct.  If (as Continental suggests) the facts as pleaded
showed that the decision to remove the Plaintiffs from flight
1218 was ultimately motivated by a reasonable concern for safety
- a legitimate, non-discriminatory reason - then the complaints
would fail to state claims for intentional discrimination, and
Continental might be expected to challenge them on that basis.
    Conversely, because the complaints do sufficiently allege
that Cureg and Dasrath were removed on the basis of race (or on
the basis of safety related inferences drawn purely and
irrationally from race), they also necessarily allege conduct
that is by nature arbitrary and therefore outside the protective
scope of § 44902. See, e.g., United States v. Armstrong, 517 U.S.
456, 464 (1996) (characterizing race as an "arbitrary
classification").  Williams itself indicates that a racially
motivated removal would not be sheltered by § 44902:  the court
noted, in approving the airline's actions, that there was "no
evidence that TWA was at any time influenced by race prejudice or
discrimination in the slightest." 509 F.2d at 948.

opportunity to make extensive investigations.

C.   Preemption by the Warsaw Convention

Continental contends that Cureg's claims are preempted by the Warsaw Convention,[13] which "governs air carrier liability for all international transportation." El Al Israel Airlines, Inc. v. Tseng, 525 U.S. 155, 160 (1999).  But neither the language nor the animating purposes of the Convention support an interpretation under which it would preempt claims for declaratory or injunctive relief as opposed to damages.  Because Cureg and the ADC assert no claims for damages, the Convention does not bar their claims.

Article 17 of the Convention establishes the conditions of liability for personal injury to passengers:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Articles 18 and 19 address conditions of liability for loss or damage to goods and for losses due to delay.  Tseng, 525 U.S. at 162-63.

_____

[13]Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, 3014 (1934), note following 49 U.S.C. § 40105.  Unless otherwise indicated, subsequent citations to the Convention refer to Articles set forth in the note following 49 U.S.C. § 40105.

The Article that Continental invokes in support of its
preemption argument is Article 24 of the Convention, which, as
amended by Montreal Protocol No. 4, provides,

> In the carriage of passengers and baggage, any action for
> damages, however founded, can only be brought subject to the
> conditions and limits set out in this Convention, without
> prejudice to the question as to who are the persons who have
> the right to bring suit and what are their respective
> rights.

Tseng, 525 U.S. at 175.[14]

In Tseng the Supreme Court held that the Convention, through
Article 24, precludes a passenger from maintaining an action for
personal injury damages under local law when his or her claim
does not satisfy the conditions for liability under the
Convention.  Id. at 670-75.  Thus, where an action for personal
injury damages arises from occurrences on board an aircraft or in
embarking or disembarking, it is barred unless it satisfies the
conditions set forth in Article 17 – including, for example, the

---

[14]The Montreal Protocol clarified (but did not alter the
substance of) the original version of Article 24, Tseng at 525
U.S. at 175, which provided

> (1) In the cases covered by articles 18 and 19 any action
> for damages, however founded, can only be brought subject to
> the conditions and limits set out in this convention.
> (2) In the cases covered by article 17 the provisions of the
> preceding paragraph shall also apply, without prejudice to
> the questions as to who are the persons who have the right
> to bring suit and what are their respective rights.

Tseng, 525 U.S. at 163.

requirement that the plaintiff allege physical injury.[15]

Tseng did not however decide the issue presented here –
whether the preemptive reach of the Convention extends to claims
for injunctive relief.  Only three courts have decided it.  In
Waters, Judge Walls, after reviewing the Supreme Court's
reasoning in Tseng, concluded that claims under anti-
discrimination laws were preempted by the Convention, and
dismissed claims for injunctive relief along with those for
damages.[16]  158 F. Supp. 2d at 422-30.  In Cruz v. American
Airlines, 193 F.3d 526, 532 (D.C. Cir. 1999), the D.C. Circuit
adopted the opposing position.  The court concluded that because
the Convention by its terms (in the English translation) preempts
only actions for damages, it does not bar claims for injunctive
relief.  Id.  Similarly, in Bayaa v. United Airlines, Inc., CV

---

[15]Cases brought under federal anti-discrimination laws are
not excepted from the Convention's general preemption of damages
claims that do not conform to its requirements.  Every court that
has addressed the issue has concluded that passengers whose
claims are governed by the Convention (international passengers
whose claims arise in connection with their travel) may not bring
claims under anti-discrimination statutes if those claims do not
conform to the conditions set forth in the Convention.  See,
e.g., King v. American Airlines, 284 F.3d 352, 361-62 (2d Cir.
2002); Waters v. Port Auth., 158 F. Supp. 2d 415, 429 (D.N.J.
2001).

[16]As Plaintiffs observe, although Judge Walls noted that the
Waters plaintiffs sought both types of relief, he did not discuss
claims for injunctive relief separately from those for damages –
apparently concluding that the same reasoning that required
dismissal of one type of claim also required dismissal of the
other.

21

02-4368, slip op. at 4-7 (C.D. Cal. Oct. 9, 2002), a case in which the ADC and an individual plaintiff have brought allegations of a race-based removal similar to the allegations in this case, the court also relied on the language of Article 24 in holding that the Convention does not preempt claims for injunctive relief.  This narrower view of the preemptive reach of the Convention appears more faithful to the text and the recognized purposes of the Convention.

If the English translation of the Convention were the governing version, one would not have to look beyond the plain language of Article 24 to conclude with the D.C. Circuit that the Convention does not preempt claims for injunctive relief.  But the version that controls is the original French, see Air France v. Saks, 470 U.S. 392, 397 (1985); and in the French the key language corresponding to "action for damages" is "action en responsabilité," which refers directly not to the type of relief sought but rather to the adjudication of liability.  See Cassell's French and English Dictionary (J.H. Douglas, Denis Girard, W. Thompson, eds. 1968) (defining "responsabilité" as "liability").  Accordingly, the French text of Article 24 may not on its face limit preemption to claims for damages.

Nevertheless, if one considers Article 24's reference to "responsabilité" in the context provided by the rest of the Convention, one is left with little reason to doubt the accuracy

22

of the English rendering of the drafters' meaning; and it becomes
evident that the preemptive reach of the Convention does not
extend to claims for injunctive relief.  The dominant theme of
the Convention, and the exclusive focus of Articles 17 through
19, to which the original, pre-clarification version of Article
24 refers, is liability for damages arising from past events.[17]

As courts and commentators have frequently observed, the
primary concern motivating the drafters of the Convention was
protecting the then fledgling aviation industry from the
catastrophic and unpredictable losses that might arise from
airline accidents.  See Eastern Airlines v. Floyd, 499 U.S. 530,
546 (1991); Andreas F. Lowenfeld & Allen I. Mendelsohn, The
United States and the Warsaw Convention, 80 Harv. L. Rev. 497,
499 (1967).[18]  Accordingly, when the Convention refers to
liability, it refers to liability in damages for past harms;[19]

---

[17]Article 17, for example, provides that the carrier shall
be "liable for damage sustained" (in French, "responsable du
dommage survenu," Saks, 470 U.S. at 397) in the circumstances
provided, "if the accident which caused the damage so sustained
took place on board the aircraft or in the course of . . .
embarking or disembarking."

[18]The secondary purpose of the Convention was to provide
uniform rules governing the documentation attending air travel
and transport and to provide uniform procedures for addressing
claims arising from air transportation.  Floyd, 499 U.S. at 546.

[19]Similarly when Tseng observes that the "cardinal purpose"
of the Convention was to "achieve uniformity of rules governing
claims arising from international air transportation," its
reference to "claims" should be understood as a reference to
damages claims, those implicating what Tseng describes as the

23

and there is no indication in the text of the Convention that the
drafters ever considered claims for injunctive relief.[20]   To
construe "action en responsabilité" to include such claims would
be to take it out of context.

---

"complementary purpose" of "accommodat[ing] or balanc[ing] the
interests of passengers seeking recovery for personal injuries,
and the interests of air carriers seeking to limit potential
liability." 525 U.S. at 169-70.  The Convention limits the
variety of claims that can be asserted (and thus the number of
claims and claimants) at the same time as it limits the amount
that any given claimant can recover; and the two restrictions
both serve the purpose of controlling the airlines' exposure in
damages.

[20]Because the Convention makes no provision for injunctive
relief, one consequence of concluding that claims for injunctive
relief under local law were preempted by Article 24 would be a
complete bar on injunctive relief in any case arising from air
travel.
    Continental contends that the Convention's failure to
address injunctive relief does not undermine the argument that
claims for such relief are preempted.  As Continental correctly
observes, the fact that claims for non-physical injuries are not
mentioned in the Convention does not prevent them from being
preempted by Article 24; and in fact, the argument that Article
24 preempts only claims for which plaintiffs could recover under
the Convention was rejected in Tseng.  525 U.S. at 168-69.
However, even though claims for non-physical injury (along with
other claims for which the Convention does not permit recovery)
are not mentioned specifically in the Convention, and are
nevertheless pre-empted, such claims are clearly included in the
general reference to actions for damages in Article 24, and in
the Montreal Protocol clarifying it (quoted in Tseng, 525 U.S. at
175).  The same cannot be said for actions seeking injunctive
relief.  Even as it makes it clear that preemption under Article
24 reaches any claim for damages arising from air transport (not
just claims involving injuries for which the Convention provides
relief), the Protocol characterizes the preemption as extending
to actions for damages.  Given the Convention's evident and
consistent focus on damages claims, there is no adequate basis on
which to construe this language to reach claims for injunctive
relief.

24

Further, the extension of Article 24's preemptive scope that
would result from such an extrapolation from the terms of the
Convention is difficult to justify on the basis of its widely
understood goals.  Permitting plaintiffs to seek injunctive
relief obviously does not remove the protection that the
Convention provides against large monetary awards.  Nor does it
create the sort of inequitable result (and inducement to artful
pleading) that the Tseng Court noted might arise if plaintiffs
with claims under local law could recover more than those with
claims under the convention.  525 U.S. at 171.

As Plaintiffs note, leaving airlines open to suits for
injunctive relief imposes nothing like the same burdens upon them
as those connected with suits for damages:  claims for injunctive
relief are essentially nothing more than attempts prospectively
to enforce compliance with the law by a particular defendant
under particular circumstances.  The fact that the Convention
does not prevent the enforcement of local laws and regulations by
governments suggests that it should not prevent individuals from
invoking the same laws in seeking injunctive relief.   In
addition, while uniformity, simplicity, and predictability are of
vital importance where damages are concerned (because of the
danger that defendants will be overwhelmed by large awards based
on novel or exotic theories), the prospective nature of
injunctive relief greatly limits the hardship that might arise

from allowing a variety of claims.

For all these reasons, an interpretation of Article 24 that does not bar claims for injunctive relief comports with the text, the overall scheme, and the manifest purposes of the Convention. Accordingly the claims in the Cureg complaint should not be dismissed as preempted by Article 24.

II. Motion to Dismiss under Rule 12(b)(1)

Continental contends that all the claims for injunctive relief should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1). It argues (1) that the ADC does not have standing to sue for injunctive relief[21] and (2) that none of the claims for injunctive relief by any of the Plaintiffs is ripe for adjudication.

A. The ADC's Standing

To have standing generally, a party must show that he or she has (1) a legally recognized injury; (2) caused by the named defendant or at least fairly traceable to the challenged action

_____

[21]In addition to contending that the ADC does not have standing under the general principles applicable in federal courts, Continental argues that it does not have standing to sue under the Warsaw Convention because it was not a passenger under the terms of the Convention. But because the ADC's claims are brought not under the Convention but under local law (which, as the foregoing discussion shows, is not preempted by the Convention where only injunctive relief is sought), their standing is not affected by any requirements in the Convention.

of the defendant; and (3) likely to be redressed by a favorable decision.  Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 561 (3d Cir.2002).  A cognizable injury for the purposes of the standing analysis is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  In order to have standing to seek an injunction, a plaintiff must show (1) he or she is likely to suffer future injury, (2) he or she is likely to be injured by the defendant, and (3) the relief sought will likely prevent the injury from occurring.  Scicchitano v. Mt. Carmel Area Sch. Bd., NO. 01-3970, 2002 U.S. App. LEXIS 17673, at *9-*10 (3d Cir. Aug. 26, 2002) (citing Roe v. Operation Rescue, 919 F.2d 857, 864 (3d Cir. 1990); 15 James Wm. Moore et al., Moore's Federal Practice, § 101.61[b][6] (3d ed. 2002)).

For an organization to have standing to sue on behalf of its members it must demonstrate that (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977); Pennsylvania Psychiatric Soc'y v. Green Spring Health Servs., Inc., 280 F.3d 278, 283 (3d Cir. 2002).

While the ADC's allegations in support of its standing are
not as compelling as they might be, they do nevertheless satisfy
the requirements for organizational standing.  First, the ADC's
members would have standing to sue in their own right:  the
complaint alleges (albeit minimally) a specific past instance of
discriminatory treatment directed at one such member by
Continental, along with a likelihood that such treatment will be
repeated.[72]

In its amended complaint the ADC offers a specific account
of an instance of discrimination against one of its members by
Continental:  it states that he and another passenger of Middle-
eastern appearance were singled out for searches, and it offers
allegations that could be interpreted as indication that the
alleged treatment was racially motivated.  Given the generous
treatment that these allegation must be accorded on a motion to
dismiss, they can be construed as stating a prima facie case of
discrimination against an ADC member.

The ADC has also alleged sufficiently that its members are
likely to be subject to discrimination in the future.
Allegations of past discriminatory conduct (including Cureg's
removal from flight 1218, the allegedly discriminatory search of

---

[72]It was the absence of such an allegation of injury to any
ADC member that the <u>Bayaa</u> court emphasized in holding that the
complaint in that case did not adequately allege facts supporting
the ADC's standing.  <u>Bayaa</u>, CV 02-4368, slip op. at 7-10 (C.D.
Cal. Oct. 9, 2002).

the anonymous ADC member, and reference to the DOT's receipt of several complaints against Continental) combine to support the general charge that Continental engages in a "practice" of discrimination.   The ADC also alleges sufficiently that its members are likely to fly Continental in the future, so that they will be in a position to be victims of any discriminatory conduct.

Because it has properly pleaded a likelihood of future injury to its members (and because the relief it seeks, enjoining future discriminatory conduct, would redress that injury), the ADC has satisfied the first prong of the organizational standing requirements.   It also satisfies the second prong, in that combating discrimination against Arab-Americans is manifestly germane to its purpose as an organization.   The third and final requirement of organizational standing is also satisfied.   While some participation in the lawsuit by individual members may be necessary for the ADC to establish the sort of pattern of discriminatory conduct that might call for injunctive relief, such a need for "sample" testimony to establish the practice against which an injunction is sought is not fatal to an organization's standing.   See Pennsylvania Psychiatric Soc'y, 280 F.3d at 283-87.


    B.    The Ripeness of Claims for Injunctive Relief

As part of its argument that the court has no subject matter jurisdiction over the ADC's claims, Continental asserts that none of the claims for injunctive relief in either complaint is ripe for adjudication.  Although it is not clear that Continental moves against the individual Plaintiffs on this basis, the following discussion assumes that Continental intends to challenge all these claims on ripeness grounds, and not just the ADC's.

The ripeness doctrine helps determine whether a dispute or claim has matured to a point warranting judicial intervention. 13A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 3532 (2d ed. 1984). The doctrine exists "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . ." Doe v. County of Centre, Pa., 242 F.3d 437, 453 (3d Cir. 2001) (quoting Abbott Laboratories v. Gardner, 387 U.S. 136, 148-149 (1967) (internal quotation marks omitted), overruled on other grounds, Califano v. Sanders, 430 U.S. 99 (1977)).  To evaluate ripeness, courts examine the "fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Doe v. County of Centre, 242 F.3d at 453.  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." Texas v. United

30

States, 523 U.S. 296, 300 (1998) (internal quotations and citation omitted).

The paradigmatic cases of unripe claims involve "abstract disagreements over administrative policies" brought before an "administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Doe v. County of Centre, 242 F.3d at 453. Where, as in the present case, the defendant is alleged to have engaged already in conduct that violates a plaintiff's rights, the force of a ripeness challenge is diminished. Cf. Id. (rejecting a ripeness challenge where allegedly discriminatory conduct had already occurred). There is nothing contingent or hypothetical about the events of December 31, 2001 as described in the complaints, and Plaintiffs allege that those events exemplify a practice of discrimination by Continental. With regard to the hardship prong of the ripeness analysis, by alleging current and continuing discriminatory conduct by Continental, the complaints clearly describe circumstances in which it would be a hardship to withhold relief. Accordingly, Continental's challenge to the ripeness of Plaintiffs' claims is without merit.[23]

---

[23]Under the heading of its ripeness argument, Continental raises the contention that the injunction sought in the Cureg/ADC complaint (enjoining Continental and its agents to "take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future) is too broad to conform to the requirements of Fed. R. Civ. P. 65(d). But while such an

31

III.      Motion to Dismiss Dasrath's Damages Claim as Precluded
          by the Contract of Carriage

Continental contends that Dasrath's claim for damages must
be dismissed because the contract of carriage under which he flew
gave Continental the right to refuse to transport him for safety
reasons[24] and because it included a clause providing

> "Except to the extent that the Warsaw Convention or other
> applicable law may otherwise require or except as
> specifically provided otherwise in this Contract of
> Carriage: . . . [Continental] shall not be liable for any
> punitive, consequential, or special damages arising out of
> or in connection with carriage or other services performed
> by [Continental], whether or not [Continental] had knowledge
> that such damage might be incurred."

Continental contends that Dasrath's remedy "for any alleged
breach of contract" is limited by the terms of the contracts of
carriage.[25]  However, as Plaintiffs correctly emphasize, their

---

injunction might very well be impermissible under Rule 65(d), as
Plaintiffs note, the specificity requirements of that rule are
not applicable in assessing an attack on the complaint.  See 11A
Wright & Miller, Federal Practice and Procedure 2d § 2955 (1995);
see also Bayaa, CV 02-4368, slip op. at 10-11 (C.D. Cal. Oct. 9,
2002)(rejecting as premature on a motion to dismiss arguments
invoking Rule 65(d).  The generality of the prayer for
injunctive relief is not a basis on which to dismiss claims in
the Cureg complaint.

   [24]As Continental describes in its brief, the contract of
carriage provides that in such cases the passenger's recovery is
limited to the value of his or her ticket.  The section of the
contract that Continental provided with its brief does not
include this particular provision.  But as the following
discussion details, taking Continental's description as true, the
contract does not operate to limit Dasrath's potential recovery.

   [25]In an apparent excess of caution, Continental directs this
argument, though explicitly confined to damages, against both
Cureg and Dasrath.  Because, as Plaintiffs' briefs confirm, Cureg

32

claims, although they arise from events that, as alleged, may
have included a breach of contract, are fundamentally not breach
of contract claims,[26] and are thus not within the scope of the
limitations that Continental invokes.[27]   In addition, to the
extent that Continental's argument relies upon its right under
the contract to remove passengers for safety reasons, it has no
bearing on Dasrath's right to recover for his asserted claims:
if his removal was based on race, it was not based on safety; if
his removal was not based on race, he has no basis on which to
recover damages.

---

seeks no damages, the argument is inapplicable to him.

[26]Although § 1981 guarantees rights relating to the making
and enforcement of contracts, a claim under § 1981 is not
identical to a breach of contract claim.   As the Court of Appeals
has noted, a breach of contract is neither a necessary nor a
sufficient element of a § 1981 claim.   See Pryor, 288 F.3d at
570.

[27] Although Continental does not specifically argue that the
contract should be read to immunize it from liability not only
for breach of contract but also for intentional torts, if the
liability provisions were read broadly enough to cover
Plaintiffs' claims, they would have such an effect.   Such a
limitation would certainly be unenforceable as against public
policy in New Jersey – and presumably under any other body of law
that may govern the contract.   See Pub. Serv. Enter. Group, Inc.
v. Philadelphia Elec. Co., 722 F. Supp. 184, 214-15 (D.N.J.
1989).

## CONCLUSION

For the reasons stated above, Continental's joint motion to dismiss the complaints will be denied in all respects. Appropriate orders will be entered.

Dickinson R. Debevoise, U.S.S.D.J.

Dated:     October  17  , 2002