**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHAEL DASRATH, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :     Civ. A. No. 02-2683 (DRD) |
| | : |
| | :     **O P I N I O N** |
| CONTINENTAL AIRLINES, INC., | : |
| | : |
| Defendant. | : |
| | : |

Reginald T. Shuford, Esq.
Catherine Y. Kim, Esq.
American Civil Liberties Union
of New Jersey Foundation
P.O. Box 32159
Newark, NJ 07102

American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004

Attorneys for Plaintiff

Peter B. Van Deventer, Jr., Esq.
Douglas H. Amster, Esq.
Seiden Wayne, L.L.C.
Two Penn Plaza East
Newark, NJ 07105

Attorneys for Defendant

**DEBEVOISE, Senior District Judge**

On December 31, 2001, Captain Werner Wolfgang Hamp, a pilot for defendant,

Continental Airlines ("Continental"), removed three passengers for security reasons from Flight

1218 departing from Newark International Airport bound for Tampa.  The passengers were

Saraleesan Nadarajah, PhD, a professor at the University of Southern Florida; Edgardo S. Cureg,

a colleague of Dr. Nadarajah at the University of Southern Florida; and Michael Dasrath, who

was traveling home to be with his family.

Plaintiff, Mr. Dasrath, filed a complaint against Continental under 42 U.S.C. § 1981; Title

VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; and the New Jersey Law Against

Discrimination (the "NJLAD"), N.J.S.A. 10:5.1, et. seq., alleging that Continental engaged in

unlawful discrimination (in violation of all three statutes) when it removed him from the aircraft.

In a separate complaint, plaintiff, Edgardo S. Cureg, alleged that Continental violated the same

three statutes when it removed him from the flight.  The American Arab Anti-Discrimination

Committee (the "ADC"), on behalf of its members, joined in Mr. Cureg's suit.  Mr. Dasrath's

complaint asserted a claim for damages and for declaratory and injunctive relief.  Mr. Cureg and

the ADC sought only declaratory and injunctive relief.

Continental moved under Fed. R. Civ. P. 12(b)(6) to dismiss all of plaintiffs' claims for

failure to state a claim and moved under Rule 12(b)(1) to dismiss certain claims for lack of

subject matter jurisdiction.  It also moved to dismiss claims for monetary relief on the ground

that any remedies should be limited by the terms of the contracts under which Mr. Cureg and Mr.

Dasrath traveled.  The court denied the motion in all respects.  Dasrath v. Continental Airlines,

Inc., 228 F. Supp. 2d 531 (D.N.J. 2002).

After considerable discovery had been taken, Continental moved for summary judgment.

Mr. Cureg and ADC voluntarily dismissed their complaint with prejudice.  The court denied

Continental's motion for summary judgment on Mr. Dasrath's claim, except as to his claim for injunctive relief, finding that "viewing the evidence in the light most favorable to Plaintiff, Plaintiff did not engage in any suspicious behavior, and there are no facts that reasonably connect him with Mr. Cureg and Dr. Nadarajah. Capt. Hamp's decision to remove him from the plane could be found to be arbitrary and capricious."

Additional discovery was taken. The court permitted Continental to file another motion for summary judgment. Although certain details of the events of December 31, 2001 are in dispute, the undisputed facts as perceived by Capt. Hamp would preclude a jury from finding that he removed Mr. Dasrath from the aircraft for racial reasons or for any reasons other than concern for the security of the aircraft and its passengers. For the reasons set forth in more detail below, Continental's motion for summary judgment in its favor will be granted, and the complaint will be dismissed with prejudice.

## I. <u>Background</u>

This case implicates two extraordinarily important public policy concerns: i) the right of all persons not to be discriminated against on account of their race or nationality and ii) the need to protect the flying public from sabotage of aircraft in flight. The former interest is embodied in the anti-discrimination laws relied upon in this case, 42 U.S.C. § 1981; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; and the New Jersey Law Against Discrimination (the "NJLAD"), N.J.S.A. 10:5-1, <u>et</u> <u>seq.</u> The latter interest is embodied in, among other laws, 49 U.S.C. § 44902(b) of the Federal Aviation Act.

These two important interests intersected in this case when, on December 31, 2001, three aircraft passengers were removed from Flight 1218 bound from Newark to Tampa. Continental

asserts that the removal was on account of security concerns.  A refusal to transport a passenger who an air carrier believes might be inimical to safety can give rise to a claim only if the carrier's decision was arbitrary and capricious, <u>Williams v. Trans World Airlines</u>, 509 F.2d 942, 948 (2d Cir. 1975).  A decision based on race would be arbitrary and capricious.  The assessment of a carrier's decision must take into account all the circumstances surrounding the decision.  In the present case, in spite of the brief period of time during which the critical events unfolded, these circumstances involve a multitude of persons and events.

There are inconsistencies in the recitals of various persons, most, if not all, of which obviously are caused by faulty observation or failure of recollection.  It is necessary to sort through the testimony and exhibits to determine if there is a core of undisputed material facts that permits summary judgment.  In the process it will be necessary initially to set forth two factual scenarios: i) The Travelers' Tale and ii) The Captain's Tale.  Because so many persons played a part in these events, it will be useful to identify each participant.

## A.  **Dramatis Personae**

1.  <u>Continental Employees</u>

<u>Lee Rogan</u> - one of two gate attendants in the boarding area

<u>Patricia Williams</u> - the other of the two gate attendants in the boarding area

<u>Captain Werner Wolfgang Hamp</u> - the pilot

<u>Robin Sue Gurnick</u> - the flight attendant who greeted passengers as they entered the plane

<u>Paula Etling</u> - the flight attendant who was making preparations in the galley during the boarding process

<u>John McCoy</u> - the flight attendant who was stationed at the rear of the aircraft

Manuel Guillan - the gate supervisor who was called to the boarding area when Capt. Hamp raised security concerns

Jeffrey Jackel - a corporate security officer who was also called to the boarding area when Capt. Hamp raised security concerns

Patricia Ware - a Continental employee who, after the event, was detailed to investigate the circumstances of Mr. Dasrath's removal

2. Passengers

Edgardo Cureg - who entered the plane and sat in first class window seat 2A.  Seat 2A is in the first row to right as one heads to the rear of the plane and faces the bulkhead.

Michael Dasrath - who entered the plane and sat in first class window seat 3A

Camille Brooks - who entered the plane and proceeded to her seat in the rear of the plane

Dr. Saraleesen Nadarajah - who entered the plane and, after talking briefly with Mr. Cureg, passed Mr. Dasrath and  proceeded to his seat in row 27 at the rear of the plane.  He later returned to the first class area to sit next to Mr. Cureg.

Anthony DiForti - who sat in the rear of the plane behind the wing

Todd Lee Colbert - who sat in the rear of the plane

Ella Jane Baker - who observed Dr. Nadarajah and Mr. Edgardo Cureg in the gate area and sat in the rear of the plane

Timothy Donegan - who was originally assigned to economy class but was moved up to first class.

## B.  The Travelers' Tale

A series of events brought Dr. Nadarajah, Mr. Cureg, and Mr. Dasrath together on Flight

1218 from Newark to Tampa on the afternoon of December 31, 2001, events which culminated in their being ejected from the flight for security reasons, when in fact they presented no security risk at all and were simply traveling home to spend the New Year with their families.

Mr. Dasrath's parents are from Guiana, and he was born there.  They are commonly characterized as West Indians.  Mr. Dasrath is a United States citizen and married in 1996.  On December 31, 2001, he departed from his work at JP Morgan Chase in midtown Manhattan, heading for Tampa, Florida, which was his home at the time and the place where his wife and children were living.

His wife had obtained a job with Continental in Tampa within the last year, and, therefore, Mr. Dasrath commuted back and forth on weekends as a non-revenue passenger.  His travel plans brought him to the Newark Airport in the late afternoon of December 31, 2001.

Earlier in the day, Dr. Nadarajah and Mr. Cureg were on the same flight from Gatwick to Newark.  Mr. Cureg has a Master's Degree in mathematics from the University of South Florida and was in the process of obtaining a doctorate in the same subject from the same University.  Dr. Nadarajah was a professor at the University of South Florida.  Mr. Cureg, the smaller of the two men, was of Philippine ancestry and Dr. Nadarajah, a large man, was of Indian background.

The two men met in the Gatwick boarding area just before boarding, and each was in the coach class on the plane to Newark.  They did not talk during the flight.  While on the flight, Mr. Cureg engaged in a cellphone call with a Filipino friend, and during the course of their conversation, the friend learned that Dr. Nadarajah was on the flight with Mr. Cureg.  The friend, Rolito Eballe, asked Mr. Cureg to ask Dr. Nadarajah when he next saw him to call Eballe back.

When Mr. Cureg encountered Dr. Nadarajah in the Newark boarding area for Flight 1218,

6

they conversed for 15 or 20 minutes, and Mr. Cureg informed him of Eballe's request.  He

offered Dr. Nadarajah his cell phone so that he could make the call.  While Dr. Nadarajah was

making the call, the announcement for first class passengers to board came through.  Mr. Cureg

told Dr. Nadarajah he could keep the cell phone and return it to him when he boarded with the

economy class passengers.

      At that point, Mr. Cureg boarded the plane and sat in seat 2A in the first class cabin.  He

does not know whether Mr. Dasrath had preceded him, but, just before or after Mr. Cureg

boarded, Mr. Dasrath sat in the seat behind him, 3A.

      Mr. Cureg was seated when Dr. Nadarajah boarded the flight.  Dr. Nadarajah returned the

cell phone to Mr. Cureg, handed it to him, thanked him, and proceeded back to his seat in the

rear.  Mr. Cureg testified that Dr. Nadarajah did not, when boarding, bend over and look under a

row of seats.

      Mr. Dasrath, who did not know or speak to Mr. Cureg or Dr. Nadarajah, was in his seat

during this time and observed the return of the cell phone and heard the few words spoken:

"Thank you" and "You're welcome."  He was also seated there when coach passenger Camille

Brooks boarded.  She was carrying a poodle and was unknown to Mr. Dasrath.  She walked past

him towards the coach area.  She returned to the first class area and walked past him, turned

around, and disappeared back in the coach area.  Later, she returned a second time and walked

toward the cockpit, looking down.  She stood in front of the area where Mr. Dasrath was sitting

and turned back towards the coach without speaking to anyone.  Mr. Dasrath did not lose sight of

her.

      Capt. Hamp, having left the plane briefly, returned to it, and Ms. Brooks signaled him

towards her.  The Captain walked back past Mr. Dasrath to Ms. Brooks.  Mr. Dasrath was able to

hear their conversation, which took place about a foot behind him.  He testified:

> Q.  And what did you hear?
>
> A.  She just basically said, those brown skin men are behaving suspiciously.
>
> Q.  This is where you now hear the brown skin . . .
>
> A.  Yes.
>
> Q.  I cut you off.  I apologize.
>
> Q.  What exactly do you claim you heard her say, exact words?
>
> A.  Those brown skin men are behaving suspiciously.
>
> Q.  Is that all you ever heard from her?
>
> A.  That's it.
>
> Q.  You couldn't hear any of the other parts of the conversation?
>
> A.  She didn't say anything else.
>
> Q.  Okay.  Could you hear Captain Hamp's response?
>
> A.  He had no response.
>
> Q.  There was no response, no words, like, jeez, I'm sorry, I'll check it out?
>
> A.  Nothing.
>
> Q.  No word?
>
> A.  No.
>
> Q.  Okay.  Is that the last time you saw the poodle lady?
>
> A.  That is the last time I saw her, yes.
>
> Q.  She returned to coach?

A.  Yes.

Q.  All right.  At that point did you speak to Mr. Cureg or Dr. Nadarajah?

A.  No.

Q.  Did you speak to anybody about what you had just heard?

A.  No.

Q.  Did you assume that she was speaking about you?

A.  I would say that would be a fair assumption because I saw her finger point.

Q.  So when you heard the comment that you made reference to already, you also simultaneously or contemporaneously saw her point at you?

A.  She went like that, basically . . .

Q.  Pointing or indicating your finger pointing?

A.  Yes.

Q.  And were you . . . in front of you, were Mr. Cureg and Dr. Nadarajah seated?

A.  Yes.

Q.  Were there any other people other than the white skin in the first class cabin at that point in time?

A.  Other than white skin?

Q.  Yes.

A.  I don't know.

Q.  So I'm asking you now for your mental impression, and I want the mental impression you had at that point, not now, not a year later, not ten minutes after the incident.  At that moment when you heard the reference and you saw her point, was it your assumption she was speaking about you or about the two guys in front of you or the three of you collectively, what were your thoughts at that point?

9

A.  My assumption at that moment was she was speaking about the three of us.

Q.  Okay.  What did you next observe, if anything, about Captain Hamp?

A.  Captain Hamp did not say anything.  He walked past us.  He looked down at me.  He looked down at the two in front of me, and Mr. Cureg and Dr. Nadarajah and he deplaned.

Q.  Of course, you have no idea what he did when he deplaned, in terms of what he did out there?

A.  I don't know what happened.

Q.  Did you speak then at that point to the two gentlemen in front of you who were also alleged to be brown skinned men?

A.  No, I did not speak to them.

Less than ten minutes later, Continental's gate supervisor, Manuel Guillan, came on board.  He called by name first Mr. Cureg, then Mr. Dasrath, and then Dr. Nadarajah, asked them to assemble their belongings, and escorted them off the airplane.  At that time, Dr. Nadarajah was sitting in front of Mr. Dasrath in the seat next to Mr. Cureg, and no one was sitting in the seat next to Mr. Dasrath.  After they got off the airplane, Mr. Guillan explained to them that the Captain did not want them on the airplane because he thought they were suspicious.

The ground crew at Continental disagreed with Capt. Hamp's decision and quickly made arrangements for the three removed passengers to obtain a flight to Orlando, Flight 1218 being the last flight to Tampa that night, and for a limousine to drive them to Tampa.  No further security checks of the passengers or their baggage were made prior to their boarding the Orlando flight.

**B.  The Captain's Tale**

Unlike The Travelers' Tale, which is an account of events that they allege actually took

place, The Captain's Tale is an account of his perceptions of the events that led him to exclude the three passengers from the flight.

Capt. Hamp's encounter with this security problem began as the aircraft boarding process began. Robin Sue Gurnick was the attendant greeting passengers as they entered. After a handful of passengers had boarded, a woman passenger (later identified as Ms. Brooks) whispered to her, "I need to talk to you." They engaged in a three or four minute conversation. Ms. Brooks stated that she was very nervous because of the behavior of some gentlemen in the boarding area. She reported that they were doing funny things, talking on cell phones. She said there were three of them but did not give a description; it was apparent to her that they knew each other but were pretending not to know each other.

Ms. Gurnick directed Ms. Brooks to her seat and said she would look into it. Ms. Gurnick testified that at first she was not unduly concerned, recognizing that people were nervous after the events of the previous 9/11. She nevertheless proceeded to the flight deck and informed Capt. Hamp that she believed they had a "Nervous Nellie" on board. She recited what Ms. Brooks had told her. Specifically, she said Ms. Brooks was concerned about three gentlemen, because that was what Ms. Brooks relayed to her, pretending not to know each other but actually knowing each other.

Ms. Gurnick did not provide any description of the men to Capt. Hamp. He asked her to advise him if there was anything else he needed to know. He did not appear concerned, and they went about their business of boarding.

A few more passengers had boarded. There were probably seven on the aircraft in all, including Mr. Dasrath who was in seat 3A first class. Ms. Gurnick testified, erroneously as will

11

be shown, that Mr. Cureg was not yet on board.  What next attracted Ms. Gurnick's attention was Dr. Nadarajah, boarding the aircraft.  According to Ms. Gurnick, as he walked past seat 2B, he put down his duffel bag and felt underneath the seat.  Ms. Gurnick associated him with Ms. Brooks, because Ms. Brooks had said that one of the gentlemen was three or four people behind her.

Dr. Nadarajah appeared nervous to Ms. Gurnick.  He then proceeded to seat 27C at the back of the plane.  He started acting in a peculiar manner.  He picked up his duffel bag and put it in the overhead bin on the other side of the aircraft a few rows forward and sat down.  He got back up, took his duffel bag, moved it up behind the exit row and proceeded back to his seat in 27C.  He continued to move his duffel bag, which Ms. Gurnick considered unusual behavior.

At about that time, Ms. Gurnick received a phone call from flight attendant John McCoy, who was stationed at the back of the plane.  He said, "There is a passenger back here very nervous, very fidgety - he is moving his bag around.  He will not stay seated."  (Gurnick Dep. at 74).  Mr. McCoy further reported that "I'm not real comfortable.  I don't know what's up here." (Id. at 75).  Ms. Gurnick, who could observe from her position both Mr. McCoy and the actions of Dr. Nadarajah that he was describing, told Mr. McCoy that she would get back to him.

Ms. Gurnick immediately reported to Capt. Hamp Dr. Nadarajah's action reaching under the seat, Mr. McCoy's observations, and her own observations of Dr. Nadarajah's peculiar behavior.

According to the Captain, Ms. Gurnick informed him that Dr. Nadarajah had squatted down, conversed with a passenger sitting in row 1 or 2, and reached under the seat.  He then moved to the rear of the aircraft, where he started moving his duffel bag from place to place.  At

that point, Capt. Hamp concluded that Dr. Nadarajah was behaving suspiciously, and he asked

Ms. Gurnick to bring Ms. Brooks to the ramp outside the aircraft so that he could talk with her.

As he left the aircraft, he noticed Dr. Nadarajah in the rear, in the process of moving his duffel

bag.

      Capt. Hamp waited in the jetway for Ms. Brooks.  His suspicions had been aroused by Dr.

Nadarajah's reaching under the seat and by his frequent moving of the duffel bag when the plane

was not full, and the fact that there was ample room in the bins over his head and elsewhere near

his seat.  When Ms. Brooks arrived, he asked her what she had seen, wanting first to check her

credibility.  He concluded she was credible and not, as he put it, "a nut case" (Hamp Dep. at 95).

She proceeded to describe what she had seen in the boarding area:

> That the - these two individuals had been in whispered conversation, but yet
> moved away and sitting apart, that they appeared to be talking to each other on
> cell phones, that they, it was her impression that they were pretending not to know
> each other, but they would get together and split and get together and split.

(Hamp Dep. at 95-96).

      Also, to Capt. Hamp's best recollection, Ms. Brooks said there was a third man that the

two men talked to in the boarding area.  She did not describe to the Captain the ethnic

background of the men in the boarding area.  After an approximately two minute conversation,

Capt. Hamp asked that Ms. Brooks be escorted back to her seat.  It was probably at this point that

Capt. Hamp made his first check with the gate attendants and learned that Dr. Nadarajah and Mr.

Cureg had flown to Newark together on a flight from England.

      Capt. Hamp returned to the aircraft.  As he returned, he saw Mr. Dasrath seated in the

second row, testifying later "during all this, I didn't even know he was all involved in all this."

(Hamp Dep. at 99).  At that time, Mr. Dasrath was seated in Row 3A behind Mr. Cureg.  While

Capt. Hamp was on the jetway, Dr. Nadarajah had moved up to sit with Mr. Cureg in Row 2.

According to Capt. Hamp, "[w]hen I got back on the airplane they were sitting side by side and

Mr. D [Dasrath] had moved behind them, and they all three seemed to be in conversation."

(Hamp Dep. at 102).  At this point, Capt. Hamp began to become concerned about Mr. Dasrath.

During the course of his investigation of the situation, Capt. Hamp had occasion to observe Dr.

Nadarajah from time to time and noticed that he was perspiring heavily and would not take his

eyes off the Captain.

　　　　While Capt. Hamp was meeting with Ms. Brooks, Ms. Gurnick continued to observe Dr.

Nadarajah's movements at the rear of the aircraft.  During that time period, a passenger seated in

the coach class, June Baker, stopped her and stated that there were two passengers whose

behavior in the boarding area made her very nervous.  She referred to them as "gentlemen" and

said they were seated in the First Class area.  She pointed out to Ms. Gurnick Mr. Dasrath and

Mr. Cureg who were then in seats 3A and 2A.  At the time, Dr. Nadarajah was still in the rear of

the plane.  At some later point, Ms. Gurnick communicated this information to the Captain.  Ms.

Gurnick next observed Dr. Nadarajah walk from the back to Row 2 in the first class cabin and sit

in seat 2B next to Mr. Cureg, who was in seat 2A.  Mr. Dasrath was seated in 3A behind Mr.

Cureg.  Ms. Gurnick testified that while she was serving drinks in the First Class at Row 4, she

heard either Dr. Nadarajah or Mr. Cureg speak to Mr. Dasrath in seat 3A.  She saw Dr. Nadarajah

turn between the seats in order to speak to Mr. Dasrath.

　　　　Prior to these later events, Capt. Hamp communicated with Continental security

personnel.  He spoke with Gate Supervisor Manuel Guillan on the telephone and stated that he

was not comfortable with certain passengers.  Mr. Guillan and Jeffrey Jackel arrived at the gate area.  Initially, Capt. Hamp explained the reasons for his concerns about Dr. Nadarajah and Mr. Cureg and asked that the gate computer be checked for available information about them.  This was done, and it was learned that the two men had been on the same London flight to Newark.  Mr. Guillan pointed out that they had gone through more security than anyone else because they had also been through customs and immigration.

Capt. Hamp left briefly to return to the plane and then, for the first time, observed Messrs. Dasrath and Cureg and Dr. Nadarajah seated together and received the additional information from Ms. Gurnick.  He returned to the gate area and asked that information be obtained concerning Mr. Dasrath, about whom his suspicions had now been aroused.  He learned that Mr. Dasrath was the husband of a Continental employee and was a non-revenue passenger.  He inquired how long Mrs. Dasrath had been employed by Continental and was informed that it was less than a year.

Two gate attendants had been on duty during the boarding process - Ms. Lee Rogan and Ms. Patricia Williams.  In the gate area prior to boarding, Ms. Brooks reported the strange behavior of two men to each of them.  They thought that one of the two men about whom she spoke was the non-revenue passenger (Mr. Dasrath).   Ms. Rogan did not communicate this information to members of the flight crew.

However, Ms. Rogan and Ms. Williams discussed Ms. Brooks's fears and agreed to address them by rescreening the men.  On the occasion of Capt. Hamp's second visit to the boarding area, Ms. Williams advised him that Mr. Dasrath was one of the persons Ms. Brooks identified as behaving suspiciously.  On deposition, she confirmed the accuracy of her post event

15

statement that read:

> Because of the female passenger's concern which she voiced to the Flight
> Attendant and then to the Captain, the Captain came out of the aircraft to ask us
> certain information about passenger one and passenger two.  I informed the
> Captain that passenger two was the spouse of an employee.

(Williams Dep. at 87, 88).

Messrs. Guillan and Jackel and the two gate attendants were satisfied that there was no

security risk.  They were unaware, of course, of the full range of information upon which the

Captain was exercising his judgment.  Capt. Hamp's response to the information available to him

at the time was that "[h]e still didn't feel secure with it . . . it wasn't adding up."  (Guillan Dep. at

74, 76).  Capt. Hamp was the person ultimately responsible for the lives of his passengers, and,

although he felt sorry to have to do it, he ordered that Dr. Nadarajah, Mr. Cureg, and Mr. Dasrath

be removed from Flight 1218.

### C.  The Other Passengers' Tales

Apart from the three passengers who were evicted from the flight, the actions and

observations of a number of other passengers cast light upon the reasons for the Captain's

decision.  As in the case of the principal actors, some of their observations and recollections may

have been faulty.  However, the totality of their actions, observations and recollections confirm

that Capt. Hamp acted solely for security reasons.

1.  Camille Brooks: The testimony of Ms. Brooks, who was one of the passengers who

played a significant role in the eviction decision, is reasonably precise as to what she observed in

the gate area before boarding and what she communicated to the flight personnel.  It is less

precise as to when and where she communicated this information to the flight personnel after

16

boarding.  For example, she does not recollect meeting with Capt. Hamp in the gateway area to the aircraft, and she does not remember, and in fact denies, standing with Capt. Hamp and pointing to the three dark skin men whom she stated acted suspiciously.  For the timing of her communications to flight personnel, it is necessary to resort to the testimony of others.

2.  Anthony DiForti: Mr. DiForti was a mechanic for the School Board of Paseo County. During the boarding process, he was sitting behind Dr. Nadarajah behind the wing in the coach area.  He reported that Dr. Nadarajah "struck [him] funny . . . the only time I caught him looking at me was through the corner of his eye."  (Di Forti Dep. at 23).  He further reported that there was consternation among the passengers caused by Dr. Nadarajah's behavior: "But once I started to see that he was even looking at me out of the corner of his eye, I figured, well, maybe I'd better just leave him alone because I don't know what's wrong with him.  And when I say shaking, I'm not talking about just a little tiny shake.  His hands were moving at least four inches a piece.  He couldn't hold onto the book that he was reading."  (Di Forti Dep. at 24).  Further, Mr. Di Forti noticed that Dr. Nadarajah was "sweating, acting nervous, jittery."

Di Forti saw Dr. Nadarajah appear to be trying to make eye contact 25 to 30 times with someone in the left front of the plane.  He was getting more nervous.  Mr. Di Forti also reported an attendant walking up and down the aisle trying to make people feel at ease.  Mr. Di Forti testified to the fear Dr. Nadarajah's conduct inspired in the passengers around him and testified to his own concern that he might be a terrorist, a concern so intense that had Dr. Nadarajah "got up to try something" or made a quick move to the bathroom he "would have taken him to the ground, held him there."  (Di Forti Dep. at 49-51).  There is no evidence that, at that time, Di Forti himself communicated his observations to the flight crew, although flight attendants

Gurnick and McCoy must have been aware of Dr. Nadarajah's conduct that Di Forti observed.

3. <u>Todd Lee Colbert</u>: Mr. Colbert's occupation is video production.  He was seated in the aircraft's coach section and testified that, when an announcement was made over the PA system, a passenger seated near him started acting strangely and he almost pushed the button to get a flight attendant.  When asked what was going through his mind at that time he testified:

> Well, I thought, you know, the way he was acting when the announcement came over was a little suspicious.  I noticed he had a big - like a bag there.  And, you know, just everything was running through my head: He's got a bomb in there, he's got something, he's going to damage the plane.  So, I was not going to - I mean, this just happened just shortly after the 9-11 thing.  I think it was pretty close to that."

(Colbert Dep. at 28).

Mr. Colbert testified that there was a commotion in the rear of the plane and that he would have gotten off if security had not come to take Dr. Nadarajah off.  Mr. Colbert did not state that he communicated directly with flight personnel, but flight attendants Gurnick and McCoy were in the aisle of the plane when the events were unfolding and were in continuing communication with the Captain.

4. <u>Ella Jane Baker</u>: Ms. Baker recalled sitting in the gate area ready to board, reading a book.  She was aroused from her reading by "a gentleman who was extremely loud."  She looked up because "he was so loud, so agitated."  He spoke to a "younger man who spoke very, very quietly."  Both were standing but "[t]he older gentlemen was very agitated, very, very nervous, very loud, fiddling with his, you know, like hands and not really pacing but he couldn't stand still."

When asked if she thought the two men were traveling together, Ms. Baker testified:

18

> That was part of the strange part.  When they first caught my attention, they were definitely standing together, conversing, about whatever.  And, then - and, I don't really remember the exact time frame but, you know, whether it was five, 10, whatever minutes, they separated.  The older man stayed where he was but the younger man left.
>
> And, it was as if they suddenly didn't know each other which I found to be unusual because, at the time when they were standing together, it was obvious that they were conversing.  Even though I couldn't hear them, I could, you know - you could tell that they were speaking to each other, one extremely loudly.  And, on two occasions they handed something to each other.  And, the younger man left, came back, left, came back.

(Baker Dep. at 18, 19).

After Ms. Baker boarded the plane, the flight attendant walked by her, and Ms. Baker stopped her and said something to the effect, "I just want to mention there was a gentleman in the gate area who seemed extremely nervous, you know, possibly he's ill," and that there were two men in the gate area who were behaving unusually.  The attendant (Ms. Gurnick) returned in three to five minutes and asked her to complete a report.  The conversation occurred before the Captain made his announcement that the flight was going to be delayed.

According to Ms. Gurnick, Ms. Baker identified Mr. Dasrath as one of the two men behaving unusually in the boarding area.  She pointed to Mr. Cureg and Mr. Dasrath in first class when identifying the men at a time when Dr. Nadarajah was still in the back of the aircraft:

> Q.  When you were speaking with Ms. Baker, was Ed Cureg there in his seat in 2A?
>
> A.  Yes.
>
> Q.  Was Michael Dasrath in his seat in 3A?
>
> A.  Yes.

Q.  Was Dr. Nadarajah sitting in 2B?

A.  No.

Q.  Did Ms. Baker indicate towards Ms. (sic) Cureg and Dasrath while she was

speaking to you?

A.  Yes.

Q.  How did she do that?

A.  She said "Two of the gentlemen are in First Class" and she kind of said "over

there."  Motioning to that side of the plane.

Q.  Can you show me when [sic, where] you were standing when you spoke with

Jane Baker?

A.  Right there (Indicating).

Q.  Could you see the two men while you were speaking with her?

A. Yes.  From here - this is first a closet.  It is very small.  It is level with the end

of the row of seats.  There is nothing that obstructs the view of any of these

passengers.

After her conversation with Ms. Gurnick, Ms. Baker returned to her book and did not

notice the agitated gentlemen on the plane or other persons on the plane who seemed nervous or

tense or who were talking with each other.

5.  Timothy Donegan: After boarding, Mr. Donegan observed little that is relevant to this

case.  Originally, he sat in the coach section.  He heard a lady (presumably Ms. Brooks)

complaining to the flight attendants and saw the flight attendants going back and forth.  Later,

Mr. Donegan was moved from coach class to first class and sat on the right side.

He observed a person who may have been a Filipino sitting one row up from him in the window seat on the left.  Apparently, Mr. Donegan was not sitting in the first class section when the critical events occurred, because the next event he recalls is when the Filipino was removed without complaint from the plane.  He learned after the fact that two other passengers were removed at the same time.

## II.  Discussion

The court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question), § 1343 (civil rights) and § 1367 (supplemental jurisdiction).

Mr. Dasrath's initial ground for denial of the motion rests upon the law of the case doctrine, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  Arizona v. California, 460 U.S. 605, 618 (1983); see also Fagan v. City of Vineland, 22 F.3d 1283, 1290 (3d Cir. 1994).  The court, having denied Continental's motion once, it is argued, should not permit the same factual and legal issues to be raised again.  There are three "extraordinary circumstances" under which a court might reconsider a prior decision notwithstanding the law of the case: "(1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice."  In re City of Phila. Litig., 158 F.3d 711, 718 (3d Cir. 1998).

There is new evidence that further supports Continental's contention that race played no part in Capt. Hamp's decision to remove Mr. Dasrath.  It need not be determined whether there is sufficient new evidence to overcome the law of the case doctrine.  In light of the importance of the public policy issues at stake, the third ground to depart from the doctrine is applicable.  The

21

earlier decision was clearly erroneous and failure to reconsider it would create manifest injustice.

A. <u>Standard of Review</u>:  Summary judgment is appropriate when the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party,"  *See* <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  <u>Id</u>.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  <u>Id</u>.   In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the nonmoving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor,'" <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999), quoting, <u>Anderson</u>, 477 U.S. at 255.  But, where the nonmoving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case," <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).

B. <u>Immunity under 49 U.S.C. § 44902</u>: The first of the two critical policy concerns involved in this case - the security of air travelers - is embodied in 49 U.S.C. § 44902 which provides:

> Subject to regulations of the Under Secretary, an air carrier, intrastate air carrier, or foreign air carrier may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety.

Thus, section 44902 gives airline personnel broad, but not absolute, discretion to remove

22

passengers purportedly for safety reasons.  Their decisions must have a rational basis in safety.

As one of the leading cases on the topic puts it,

> The test of whether or not the airline properly exercised its power under [§ 44902] to refuse passage to an applicant or ticket-holder rests upon the facts and circumstances of the case as known to the airline at the time it formed its opinion and made its decision and whether or not the opinion and decision were rational and reasonable and not capricious or arbitrary in the light of those facts and circumstances.

Williams v. Trans World Airlines, 509 F.2d 942, 948 (2d Cir. 1975).

The standard for assessing an airline's decision to refuse to transport a passenger is a very lenient one, requiring only that the carrier's decision not be arbitrary or capricious.  Although Williams uses the term "reasonable," among others, in describing the scope of the discretion authorized by the statute, it is important to recognize that here, "reasonable" draws its meaning from the terms accompanying it, and that § 44902 does not permit a carrier to be held liable where it is merely negligent in deciding that a passenger might be "inimical to safety."  See Adamsons v. American Airlines, Inc., 444 N.E.2d 21, 24-25 (N.Y. 1982) ("We do not believe that Congress, in enacting the Federal Aviation Act, intended to test the airline's discretion to deny passage to certain persons by standards of negligence.")[1].  As Williams and later cases applying § 44902 confirm, the statute protects any decision that is not capricious or arbitrary. See, e.g., Schaeffer v. Cavallero, 54 F. Supp. 2d 350, 351 (S.D.N.Y. 1999) (Refusal to transport

---

[1]  Noting that decisions to transport passengers must often be made on the spur of the moment, the court in Adamsons (addressing the refusal to transport a sick passenger) refused to impose a duty of investigation on carriers:

> Absent a showing of arbitrariness, plaintiff's argument that defendant was negligent in failing to obtain information necessary to make its decision is unpersuasive.  In this case, there was no showing of arbitrariness as a matter of law.  444 N.E.2d at 25.

cannot give rise to liability unless arbitrary and capricious); <u>Norman v. Trans World Airlines</u>, 2000 WL 1480367, at *2 (S.D.N.Y. Oct. 6, 2000) (same); <u>Christel v. AMR Corp.</u>, 222 F. Supp. 2d 335 (S.D.N.Y. 2002)(same).

 As <u>Williams</u> implies, and as the cases following it illustrate, the standard for reviewing a carrier's decision is not a subjective one: even in <u>Adamsons,</u> which offers one of the most emphatic endorsements of broad discretion under § 44902, the court stated that the carrier's discretion is protected "if exercised in good faith <u>and for a rational reason</u>."  444 N.E.2d at 24 (emphasis added).

 The objective assessment of a carrier's decision must take into account all the circumstances surrounding the decision, including the (perhaps limited) facts known at the time; the time constraints under which the decision is made; and, not least, the general security climate in which events unfold.  In <u>Williams</u>, for example, the court noted that one of the factors contributing to the decision not to transport the plaintiff was "the danger of hijacking in light of those recently experienced [in 1969] by TWA and other airlines."  509 F.2d at 945.  It should not be forgotten that the decisions at issue were made in an atmosphere pervaded by the fears and uncertainties arising from the events of the previous September 11, 2001 and the shoe-bomber's failed attempt to blow up an aircraft in flight just a week before.  There is no denying that, as the Court of Appeals recently observed, those events and their aftermath are "reflected in thousands of ways in legislative and national policy, the habits of daily living, and our collective psyches." <u>North Jersey Media Group, Inc. v. Ashcroft</u>, 308 F.3d 198 (3d Cir. 2002).

 C.  <u>Unlawful Discrimination</u>: The second of the two critical policy concerns involved in this case - the prevention of discrimination based on race or national origin - is embodied in

numerous statutes, state and federal.  To establish a case of unlawful discrimination under §

1981(a), plaintiff must show: (1) plaintiff's membership in a racial minority; (2) an intent to

discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more

of the activities enumerated in § 1981, including the right to make and enforce contracts.  Pryor

v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 569 (3d Cir. 2002).  Under Title VI, a plaintiff

must demonstrate (1) membership in a minority; (2) intentional discrimination; and (3) receipt of

federal funds by the defendant.  42 U.S.C. § 2000d.  Under the NJLAD a plaintiff must show that

(1) defendant operates a place of public accommodation; (2) the plaintiff is a member of a

protected class; and (3) he or she was denied equal treatment on the basis of his or her

membership in a protected class.  N.J.S.A. 10:5-12.

 Generally, to survive summary judgment in a claim for unlawful discrimination, be it

under § 1981, Title VI, or the NJLAD, a plaintiff is required to establish a prima facie case of

discrimination.  Then the burden shifts to the defendant to articulate a legitimate, non-

discriminatory reason for the alleged discriminatory conduct.  Should the defendant offer such a

reason, the plaintiff can survive summary judgment by submitting evidence that defendant's

justification is merely a pretext.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)

(setting forth the above standard, commonly referred to as the McDonnell Douglas standard, for

analyzing claims of unlawful discrimination).

 The only disputed issue in the present case is whether Capt. Hamp ejected Plaintiff

because of his race.  The McDonnell Douglas burden-shifting analysis, which is useful in

deciding motions for summary judgment, must be applied in the context of a federal statute that

addresses vital public concerns.  Under the Federal Aviation Act, 49 U.S.C. § 44902(b), an air

carrier "may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety." "Such a refusal cannot give rise to a claim for damages under either federal or [state] law unless the carrier's decision was arbitrary and capricious." Williams, 509 F.2d at 948. That Act gives airline personnel broad, but not absolute, discretion to remove passengers for safety reasons. Williams, Id.; Al-Qudhai'een v. Am. Airlines, Inc., 267 F. Supp. 2d 841, 846 (S.D. Ohio 2003).

Thus, the standard for reviewing a carrier's decision is an objective one and the carrier's discretion is protected so long as it acted in good faith and its decision was rational. Dasrath, 228 F. Supp. at 539.

In Al-Qudhai'een, the court granted the defendant airline's motion for summary judgment against two Saudi Arabian citizens who sued the airline after being removed from a flight. In that case, the court found that the captain's decision to remove the two passengers was reasonable because he based his decision on reports that:

> 1) plaintiffs disobeyed defendant DeCampo's instructions and changed seats without permission; 2) plaintiff Al-Qudhai'een entered the first class area and proceeded to walk toward the cockpit without obtaining permission; 3) plaintiff Al-Qudhai'een appeared to be "anxious" when he asked defendant Asada questions regarding the flight and became "irritated" and "uneasy" when informed that it would be stopping in Columbus, Ohio; and 4) defendant DeCampo considered plaintiff Al-Qudhai'een's questions about whether the plane they were currently on would also be the one that would travel on to Washington, D.C. to be uncommon for a passenger.

Al-Qudhai'een, 267 F. Supp. 2d at 847. Given the above incidents, and taking into account all of the circumstances known to the captain, the court found that it was reasonable for him to remove the plaintiffs from the plane.

The above incidents refer primarily to plaintiff Al-Qudhai'een, and yet the court found it

reasonable to remove plaintiff Al-Shalawi as well.  It should be noted, however, that the two

passengers were flying together and that the flight crew knew they were together because

plaintiff Al-Qudhai'een asked a flight attendant if he could sit next to plaintiff Al-Shalawi.  Thus,

although not expressly discussed by the court, it appears that plaintiff Al-Qudhai'een's activity

was imputed to plaintiff Al-Shalawi because the two were traveling together.

In the present case, Dr. Nadarajah's behavior was similar to that of plaintiff Al-

Qudhai'een in the above case.  Thus, it was reasonable for Capt. Hamp to have him removed

from the plane.  As Mr. Cureg was connected with Dr. Nadarajah, in that the two appeared to

know each other, interacted in the boarding area and on the plane, and were engaged in

conversation, just as plaintiff Al-Shalawi was connected with plaintiff Al-Qudhai'een, it was

reasonable for Capt. Hamp to remove Mr. Cureg as well.  Had not Mr. Cureg voluntarily

dismissed his complaint it would undoubtedly have been dismissed upon completion of

discovery.

D.  <u>Mr. Dasrath's Removal</u>: Unquestionably Mr. Dasrath has established a <u>prima</u> <u>facie</u>

case under the <u>McDonnell Douglas</u> inquiry.  He is a member of a racial minority.  He was a

lawful passenger on Flight 1218, and he was removed from that flight when white passengers

were not removed.  Continental has proffered a compelling non-race reason for the removal - a

perceived threat to the security of the passengers.

The ultimate question becomes whether Mr. Dasrath has presented sufficient evidence

that would permit a reasonable jury to infer that Continental's proffered reason was not the real

reason and that a motivating factor in Mr. Dasrath's removal was his race.  This inquiry is

complicated by the fact that the inquiry is not solely about what happened; the inquiry is what

Capt. Hamp reasonably believed had happened.  It must be assumed that all of Mr. Dasrath's testimony is true, and in fact, there is nothing in his testimony that the court is inclined to disbelieve.  On the other hand, if Capt. Hamp reasonably believed that something had taken place (even if it had not), his reasonable belief is what is critical, not what actually took place.

Unquestionably, Dr. Nadarajah and Mr. Cureg engaged in conduct that raised reasonable concerns in Capt. Hamp's mind that justified, perhaps required, that he remove them from the flight.  The question remains whether undisputed evidence establishes that Capt. Hamp's reasonable perceptions of the relationship between Dr. Nadarajah and Mr. Cureg on the one hand and Mr. Dasrath on the other hand, was the reason for Mr. Dasrath's removal from the plane rather than race.  The court concludes that, when the circumstances are viewed in their entirety, a jury would be compelled to find that security considerations were the sole reason for Capt. Hamp's decision.

To start with, the passengers and the flight crew were functioning at a time less than three months after the events of September 11, 2001 and only a week after the shoe bomber's failed attempt to down the aircraft originating in Paris with a United States destination.  There is no evidence that Capt. Hamp was unduly disturbed by these considerations, as demonstrated by his initial wait and see response to Ms. Gurnick's report of Ms. Brooks's account of suspicious activity.

Further, an examination of the testimony in the case shows that Capt. Hamp never even identified the three removed passengers by their race; he identified them by their seat numbers or by where they were located in the plane.  If the crew members or passengers spoke of the three men it was seldom by race, and when it was, the use of "Middle Eastern", "dark complexioned"

28

or similar terms was purely for the purpose of identification.  Even Ms. Brooks's reference to "brown skin men" was purely as a means of identification of the three men in the first class section.

It is Capt. Hamp's perception that is determinative, because it was he that made the final removal decision.  His first awareness that there was a possible security problem was when Ms. Gurnick entered the flight deck and reported Ms. Brooks's account of the suspicious behavior of the men in the boarding area, their conversing, then separating and later pretending not to know each other, and their use of cell phones.  It is uncertain whether at that point Ms. Brooks had mentioned two or three dark skin men.  Neither Ms. Gurnick nor Capt. Hamp were unduly concerned, and Capt. Hamp simply instructed Ms. Gurnick to report any further developments.

As for Capt. Hamp, the next relevant occurrence was Ms. Gurnick's return to the flight deck.  She recounted somewhat more disturbing observations.  She informed Capt. Hamp that shortly after her return to her post at the entrance way, the man, later identified as Dr. Nadarajah, entered carrying a duffel bag.  At seat 2B he put it down, leaned down, and felt under the seat; then, appearing nervous, he picked up his duffel bag and proceeded to his seat in the rear of the plane.  Ms. Gurnick described his bizarre behavior there, repeatedly moving his duffel bag from one overhead bin to another and changing his seat.  She described the telephone call she received from Mr. McCoy recounting his observations of Dr. Nadarajah's behavior.

This information impelled Capt. Hamp to investigate further.  He asked Ms. Gurnick to request that Ms. Brooks meet him in the jetway so that he could assess her credibility.  As Capt. Hamp proceeded to the jetway, he noticed Dr. Nadarajah in the rear of the plane in the process of moving his duffel bag.  Capt. Hamp found this to be suspicious because there was plenty of bin

29

space over Dr. Nadarajah's seat.

Capt. Hamp confirmed with Ms. Brooks the information she had previously provided and found it credible.  He had noticed Mr. Cureg, the person sitting in Seat 2A, next to then empty seat 2B, the seat under which Dr. Nadarajah had reportedly reached, and he had noticed Mr. Dasrath in seat 3A.  He had no reason at that time to be concerned about Mr. Dasrath, but he was concerned about Dr. Nadarajah and about Mr. Cureg.

It appears that, in light of Mr. Cureg's and Mr. Dasrath's testimony, Ms. Gurnick's perception of what Dr. Nadarajah was doing at seat 2B was wrong, but what he actually did would have further fueled Capt. Hamp's concerns.  According to the testimony of both Mr. Dasrath and Mr. Cureg, Dr. Nadarajah was not reaching under the seat but was putting down his duffel bag, leaning towards Mr. Cureg in seat 2A, and handing him a cell phone.

Capt. Hamp's best recollection is that, at the outset on the jetway, Ms. Brooks told him that there was a third man to whom the other two men talked in the boarding area, but it is uncontested that ultimately on the plane Ms. Brooks said that there were three men.

Capt. Hamp checked with the gate attendants in the boarding area and learned that Dr. Nadarajah and Mr. Cureg had flown together from England to Newark.  This did nothing to allay his doubts about them.  Then, when he returned to the plane, adding to his concern, was his observation that Dr. Nadarajah had moved from his assigned seat at the rear of the plane and was sitting in seat 2B beside Mr. Cureg.  Observing the three men in seats 2A, 2B and 3A, they seemed to be in conversation.  At that point, Capt. Hamp became concerned about the role of Mr. Dasrath.

Ms. Gurnick advised him of her conversation with Ms. Baker who had confirmed Dr.

30

Nadarajah's strange behavior in the boarding area and his interaction with a shorter quieter man there.  At a time when Dr. Nadarajah was still at the back of the plane, Ms. Baker pointed out to Ms. Gurnick the men in seats 2A and 3A as the persons she had seen in the boarding area.

Capt. Hamp returned to the gate area where he talked with security personnel Guillan and Jackel.  In view of the new concerns about Mr. Dasrath, he asked the gate attendants about him and learned that he was a non-revenue passenger, married to a Continental employee.  Upon further inquiry he learned that Mr. Dasrath's wife had been employed less than a year.  Gate attendant Williams told Capt. Hamp that one of the passengers about whose suspicious activities Ms. Brooks complained was "the spouse of an employee."

Mr. Dasrath himself provides the evidence of what occurred when Capt. Hamp returned to the plane on either the first or second occasion.  His testimony is quoted in full above, but, in essence, he stated that Ms. Brooks signaled him to a position behind seats 2A and 3A and pointed out all three men as the persons who had engaged in the suspicious activity.  In its February 16, 2006 opinion denying summary judgment, the court found room to doubt that Ms. Brooks was pointing to Mr. Dasrath: i) she may have been referring only to Mr. Cureg and Dr. Nadarajah or ii) she may have referred to all three passengers but her use of the term "brown skin men" would have led Capt. Hamp to have doubts as to whether she was identifying the men solely on the basis of their race.   Mr. Dasrath's testimony can be interpreted only to mean that Ms. Brooks was pointing to him as well as Dr. Nadarajah and Mr. Cureg.  In light of the circumstances known to Capt. Hamp, he would have had no reasonable basis to believe that Ms. Brooks was making her identification based on race.

In the summary judgment opinion the court stated:

31

> Therefore, viewing the facts in the light most favorable to Plaintiff, the only facts
> that might justify Captain Hamp's decision to remove Plaintiff are (1) his
> proximity to Mr. Cureg and Dr. Nadarajah; and (2) Ms. Brooks's statement to
> Captain Hamp that "those Brown skin men are acting suspicious".

In light of all the evidence, both new and old, that finding is clearly erroneous.  There is

ample undisputed evidence linking Mr. Dasrath to the other two men.  As recited above, there

were many events that would have led a reasonable person to believe that the three men,

including Mr. Dasrath, were security risks.  The lives of the passengers on Flight 1218 were in

Capt. Hamp's hands, not in the hands of the security officers or the gate attendants.  Even though

Mr. Dasrath, Dr. Nadarajah, and Mr. Cureg were not in fact security risks, on the basis of facts

known to him, it was reasonable for Capt. Hamp to consider them a risk and to order their

removal from the plane.

Mr. Dasrath proffers, in opposition to this conclusion, the contrary judgments of other

Continental employees who at the time disagreed with Capt. Hamp's decision and, in the case of

Patricia Ware, conducted a post-event investigation.

Mr. Guillan later confirmed that he was unaware of critical factors upon which Capt.

Hamp relied and that, had he been aware of them, he would have been concerned about Mr.

Dasrath and believes that, in their light, Mr. Dasrath would have been removed had he been

white.

Ms. Williams acknowledged that she was unaware of what happened on the aircraft or the

circumstances that led to the Captain's decision.  In view of those circumstances, she now

believes the decision was the correct one.

Ms. Ware made an after-the-fact investigation and reported to Continental that she

believed Mr. Dasrath's removal was the result of racial discrimination. By reason of the manner in which this investigation was conducted, it would not have been admitted in evidence. It is evidence of Continental's efforts to prevent employees from engaging in racial discrimination. It is not evidence that Capt. Hamp engaged in such conduct.

Ms. Ware did not discuss the event with Capt. Hamp or get a written statement from him. She did not see the statements or documents disclosing that Dr. Nadarajah and Mr. Cureg were talking to each other and the appearance of Dr. Nadarajah reaching under the seat. She had not seen Mr. McCoy's statement describing his observations. She had not seen documentation describing Dr. Nadarajah moving his duffel bag many times. On being advised of the totality of the circumstances of the December 31, 2001 event, Ms. Ware testified:

> If you look at all of the facts, with the behavior of the three gentlemen and the fact that there was some interaction that I wasn't aware of, I would probably think that our crew quite honestly, for the purpose of safety's sake with all that had been going on, probably did what they thought was the right thing to do. That's honestly the way that I see it.

(Dare Dep 108-09).

### III. Conclusion

It's truly unfortunate that persons such as Mr. Dasrath are seriously inconvenienced in the interests of flight security. It is also unfortunate that flight crews and airlines must be put to such major efforts to establish the reasonableness of their decisions. These are burdens that the nature of the times imposes upon us.

An analysis of all this evidence establishes that there are no issues of fact that preclude a finding that Capt. Hamp acted reasonably when he removed Mr. Dasrath, that he removed him solely for security reasons, and that Mr. Dasrath's race was not a motivating factor. The court

will file an order in accordance with this opinion.


                                       **/s/  Dickinson R. Debevoise**

Dated: December 22, 2006          DICKINSON R. DEBEVOISE
                                         U.S.S.D.J.